IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

GTSI CORP.,                    )
                               )
    Plaintiff,              )
                               )
        v.              )      1:09cv123 (JCC)
                               )
WILDFLOWER INT'L, INC.,        )
                               )
    Defendant.              )

## **M E M O R A N D U M   O P I N I O N**

This matter comes before the Court on Plaintiff GTSI Corp.'s Motion to Dismiss and to Strike Counterclaims.  For the following reasons, the Court will grant in part and deny in part GTSI Corp.'s motion to dismiss and deny its motion to strike.

### **I. Background**

This case arose out of an alleged instance of corporate espionage.  On February 9, 2009, Plaintiff GTSI Corp. ("GTSI") filed a complaint (the "Complaint") stating that Defendant Wildflower International, Inc. ("Wildflower") improperly came into possession of trade secret information related to GTSI's pursuit of a contract from the United States Department of Homeland Security ("DHS").  The Complaint contains a single count alleging a violation of the Virginia Uniform Trade Secrets Act. The Court denied Wildflower's motion to dismiss the claim against it.  Wildflower then filed its answer to the Complaint, which

1

included five grounds of defense and a lengthy four-count counterclaim ("Counterclaim").  The allegations in the Counterclaim are as follows.

Under United States Small Business Association ("SBA") rules, GTSI cannot bid on small business contracts either as a general contractor or in affiliation with a small business. (Countercl. ¶ 1.)  After Wildflower successfully protested a $165 million contract obtained by GTSI, GTSI set out to, in its own words, "crucify" and "punish" Wildflower.  (Countercl. ¶ 1.)  It did so by conspiring with Wildflower's competitors and other entities to harm Wildflower's business and tortiously interfere with its business opportunities and existing contracts. (Countercl. ¶ 1.)

In September 2007, DHS, through its FirstSource contracting program ("FirstSource Program"), gave eleven small businesses ("FirstSource Businesses") the ablity to bid for certain DHS contracts ("FirstSource Contracts").  (Countercl. ¶ 6.)  To obtain FirstSource Contracts, a FirstSource Business must certify that it meets the SBA's small business size regulations as set forth in 13 C.F.R. Part 121.  (Countercl. ¶ 7.)

The FirstSource Businesses are also subject to 15 U.S.C. § 645, which provides criminal penalties for businesses that knowingly misrepresent their small business size status in

2

connection with a federal procurement program.  (Countercl. ¶ 7.)
SBA regulations and FirstSource Contracts require the FirstSource
Businesses to perform the majority of the services required of
the prime contractor on each FirstSource Contract.  (Countercl.
¶ 8.)  The regulations and contracts also forbid FirstSource
Businesses from "affiliating" with a large business – that is, a
large business cannot exercise control, in practice or in name,
over a FirstSource Contract or provide such vital services to the
FirstSource Business that the FirstSource Business relies upon
the large business to successfully perform its contract.
(Countercl. ¶ 9.)  However, FirstSource Businesses can work with
large manufacturers of software and equipment, such as Dell or
the Hewlett Packard Company ("HP"),[1] to fulfill the FirstSource
Contracts.  (Countercl. ¶ 10.)

        Wildflower was selected as a FirstSource Business.  It
has bid on, won, and performed a number of FirstSource Contracts.
(Countercl. ¶ 12.)  GTSI is not a FirstSource Business and,
because of its large size, it cannot affiliate with FirstSource
Businesses to work on FirstSource Contracts.  (Countercl. ¶ 13.)
Wildflower alleges, on information and belief, that GTSI did
affiliate with four FirstSource Businesses, including
MultimaxArray FirstSource ("MultimaxArray") and Government
Acquisitions, Inc. ("GAI"), to bid for, obtain, and fulfill

---

[1] Government contractors refer to large suppliers like Dell and HP as
"original equipment manufacturers" ("OEMs").

FirstSource Contracts.  (Countercl. ¶ 14.)  GTSI acted as the *de facto* prime contractor on FirstSource Contracts awarded as a result of its affiliation with the FirstSource Businesses and realized the majority of the revenue and profit from the FirstSource Contracts.  (Countercl. ¶¶ 14, 17.)

For example, Wildflower learned from several OEMs that, in the summer of 2008, GTSI was preparing a FirstSource Contract proposal in affiliation with MultimaxArray.  (Countercl. ¶ 15.) The four FirstSource Businesses with which GTSI improperly affiliated won a number of FirstSource Contracts since March 15, 2007 – contracts for which Wildflower also submitted bids and on which it believes, on information and belief, that it was the "runner-up" bidder.  (Countercl. ¶¶ 18-19.)

In the summer of 2008, the United States Citizenship and Immigration Services ("USCIS") issued a bid solicitation for a multi-year "Master Delivery Order" in which the winning company would furnish a large quantity of computer equipment, hardware, software, and other services to more than 300 USCIS offices around the world (the "USCIS Contract").  (Countercl. ¶ 20.)  In preparation for its bid, Wildflower entered into a "teaming agreement" with Dell that would allow it to purchase Dell products if Wildflower won the USCIS Contract.  (Countercl. ¶ 20.)  Wildflower submitted its bid on July 24, 2008. (Countercl. ¶ 22.)

On September 23, 2008, USCIS notified Wildflower that it had awarded the $165 million USCIS Contract to MultimaxArray. (Countercl. ¶ 23.)  Two subsequent events led Wildflower to believe that GTSI was behind the MultimaxArray bid.  First, at the "kick-off" meeting for the USCIS Contract, held on September 18, 2008, GTSI personnel, not MultimaxArray personnel, were the primary contractor representatives.  (Countercl. ¶ 24.)  Second, on September 19, 2008, Wildflower received a copy of an eight-page teaming agreement between GTSI and Dell, which stated that GTSI was acting as the prime contractor in preparation for a bid on the USCIS Contract.  (Countercl. ¶ 25.)

Wildflower then filed a size protest with the USCIS to challenge MultimaxArray's eligibility for the USCIS Contract. The USCIS forwarded the size protest to the SBA, which contacted MultimaxArray about the allegations.  (Countercl. ¶¶ 27-28.) MultimaxArray declined to provide information requested by the SBA and did not contest Wildflower's allegations.  The SBA subsequently issued a "size determination" in which it "determined that Multimax is not a small business concern for this [USCIS] procurement."  (Countercl. ¶ 30.)  The USCIS terminated the award to MultimaxArray and reopened the bidding. (Countercl. ¶ 31.)  Wildflower and GAI, another FirstSource Business, competed for the contract; Wildflower alleges on information and belief that GTSI then affiliated with GAI to bid on the USCIS Contract once again.  (Countercl. ¶¶ 32-33.)

5

On January 15, 2009, the USCIS awarded the contract to Wildflower.  (Countercl. ¶ 35.)  GAI then filed a "size protest" with the SBA and a separate protest with the Government Accountability Office (the "GAO") against Wildflower, both related to the USCIS Contract.  (Countercl. ¶¶ 36-37.)  The GAO dismissed the allegations against Wildflower, and the SBA determined that Wildflower was a legitimate small business eligible for the USCIS Contract.  (Countercl. ¶¶ 37-39.)

After these events, GTSI conspired with or attempted to conspire with other companies to harm Wildflower's business by, among other things, stating to a number of OEMs that it was going to "crucify" and "punish" Wildflower for protesting GTSI's contract and "punish" whoever had provided Wildflower with a copy of GTSI's teaming agreement with Dell.  (Countercl. ¶ 41.)  As part of a collaborative effort to harm Wildflower's business, a GAI executive urged several OEMs not to do business with Wildflower and told them that Wildflower would be made to regret its bid protest.  (Countercl. ¶ 42.)  Later, a representative of one of the OEMs from which Wildflower intended to buy goods to fulfill the USCIS Contract, and which also served as a major vendor for GTSI, contacted Wildflower's president and told him that Wildflower would not be allowed to purchase products from the OEM to fulfill the USCIS Contract.  (Countercl. ¶ 43.)  The OEM representative told Wildflower's president to withdraw the company's bid or inform USCIS that Wildflower could not provide

the required products.  (Countercl. ¶ 43.)  As a result of these attacks on Wildflower, the company had to expend time and money to investigate alternative sources of goods.  (Countercl. ¶ 44.) GTSI representatives also told Dell representatives that GTSI would retaliate against any individual or company assisting Wildflower.  Additionally, GTSI attempted to induce Dell and other OEMs to stop providing Wildflower with favorable terms and prices as part of a conspiracy to harm Wildflower.  (Countercl. ¶ 46.)

Wildflower brings four counterclaims based on these facts: Count I, for conspiracy to injure business, pursuant to Va. Code Ann. §§ 18.2-499 - 18.2-500; Count II, for attempted conspiracy to injure business, pursuant to the same statutes; Count III, for common law conspiracy; and Count IV, for tortious interference with business opportunity and expectancy.  In recompense, Wildflower seeks, for Counts I and II, compensatory damages of at least $250,000.00, trebled in accordance with Va. Code Ann. § 18.2-500, and punitive damages of $350,000.  For Counts III and IV, it seeks compensatory damages of $5,000,000.00, punitive damages of $350,000.00, and an order requiring GTSI to pay Wildflower's costs and attorney's fees. (Countercl. 21.)

GTSI moved to dismiss the Counterclaims and to strike paragraphs 6-19 and 27-39 from them on June 3, 2009.  Wildflower opposed the motion on June 17, and GTSI filed a reply brief on

June 25.  On July 2, 2009, the Court heard oral argument on the motions.  After the argument, GTSI filed a post-hearing brief further explaining its preemption argument.  On July 2, 2009, Wildflower moved to strike the post-hearing brief or, in the alternative, to submit a response.  Because the supplemental briefs are responsive to a question raised at oral argument, the Court finds it appropriate to consider both briefs.  It will deny Wildflower's motion to strike GTSI's supplemental brief but grant its motion to submit a responsive memorandum.  GTSI's motion to dismiss and motion to strike are before the Court.

## II.  Standard of Review

A. <u>Motion to Dismiss</u>

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) (citation omitted).  In deciding a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citation omitted).  Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*  A motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a

8

cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).

B. Motion to Strike

Rule 12(f) allows a court, acting either on its own or on a motion, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Before granting a motion to strike, a court must find the allegations in question "both immaterial and prejudicial."  *Hare v. Family Publ'ns Serv., Inc.*, 342 F. Supp. 678, 685 (D. Md. 1972).  A motion to strike "is neither an authorized nor a proper way to procure the dismissal of all or part of . . . a counterclaim."  5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1380 (3d ed. 2004).

Most courts hold that Rule 12(f) motions to strike impertinent or scandalous matters "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."  *Id.* at § 1382.  A Rule 12(f) motion falls within the discretion of the district court.  *Id.*; *see also Xerox Corp. v. ImaTek, Inc.*, 220 F.R.D. 241, 243 (D. Md. 2003).

### III. Analysis

A. Rule 12(b)(1) Motion to Dismiss

GTSI first argues that the Court lacks subject matter jurisdiction over Wildflower's counterclaims because the four

causes of action all relate to the federal bidding and contract procurement process – over which, GTSI asserts, the Court of Federal Claims, the GAO, the SBA, and the relevant procuring agency – but not this Court – have jurisdiction.  (Pl.'s Mem. in Supp. 3-4.)

The Court finds, to the contrary, that the factual underpinnings of this case – which arose out of GTSI's allegedly nefarious maneuverings to secure federal contracts and impair Wildflower's ability to do so – do not automatically strip this Court of jurisdiction over Wildflower's four state law claims.

First, none of Wildflower's counterclaims constitutes a "bid protest" that can be adjudicated only by the relevant agency or the GAO.  Bid protests generally challenge *government* action, such as the cancellation of a solicitation, the award of a contract, or the termination or cancellation of an awarded contract.  *See* 31 U.S.C. § 3551(1); *see also* 48 C.F.R. § 33.101. Similarly, the Court of Federal Claims could not hear the counterclaims, because it "does not have jurisdiction over suits against individuals; it only has jurisdiction over suits against the United States." *Cottrell v. United States*, 42 Fed. Cl. 144, 148 (Fed. Cl. 1998) (citations omitted) (discussing limited Tucker Act jurisdiction); *see also* 28 U.S.C. § 1491(b)(1) ("Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation

by a Federal agency for bids or proposals . . . or to a proposed
award or the award of a contract . . . in connection with a
procurement or a proposed procurement.").

GTSI's argument that this case should have been brought
before the SBA also fails to support dismissal at this time.
Citing the statute authorizing the SBA to designate certain
businesses as "small business concerns," GTSI claims that
Wildflower is seeking damages for GTSI's alleged violations of
federal business size and business affiliation rules, and that no
private cause of action allows a failed bidder to sue a third
party for violations of such rules in district court.  (Pl.'s
Mem. in Supp. 4-5 (*citing* 15 U.S.C. § 637(b)(6))).  But
Wildflower is not directly suing GTSI for violating SBA business
size status rules.  Instead, it brings its counterclaims for
conspiracy and tortious interference in which part of the alleged
wrongful conduct involved improper bidding.

GTSI is right to raise the possibility that litigants
may improperly use state causes of action to take a second (or
belated first) bite at a federal procurement challenge.  At this
stage of the litigation, however, the Court cannot rule as a
matter of law that Wildflower is engaged in such an endeavor.
Wildflower pled improper bidding and improper affiliation as
facts, and in evaluating GTSI's motion the Court must accept them
as such.  If it later becomes evident that Wildflower cannot
prove its allegations, or that doing so would require this Court

11

to make legal findings reserved exclusively to administrative or other executive agencies – such that this Court lacks all power to make them – then summary judgment may be the proper remedy.

Indeed, courts have allowed for the possibility that state law tort claims based on underlying procurement violations could proceed. *See Tectonics, Inc. v. Castle Constr. Co., Inc.*, 753 F.2d 957 (11th Cir. 1985) (finding that a claim for tortious interference with business expectancy based on a business size determination was not preempted); *see also Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 494-95 (10th Cir. 1987) (rejecting the proposition that "Congress intended to preclude states from using SBA standards as evidence of violations of the states' causes of actions.")

In short, the Court cannot now say that Wildflower's state law claims are bid protests. That they arose in part out of contested federal procurement proceedings does not automatically convert them into bid protests. The gravamen of Wildflower's complaint is that GTSI tortiously conspired with others to harm its business. Other courts have allowed state law tort claims even more closely tied to federal procurements to progress past motions to dismiss, *see Rescue Phone, Inc. v. Enforcement Tech. Group, Inc.*, 2007 WL 2045514 (E.D. Va. July 9, 2007), and demurrers, *see H.E.R.C. Prods., Inc. v. Turlington*, 2003 WL 23162378 (Va. Cir. Ct. Sept. 17, 2003). The Court will

12

not dismiss the counterclaims based on a lack of subject matter jurisdiction.

    B. <u>Rule 12(b)(6) Motion to Dismiss</u>

        1. <u>Virginia Conspiracy Act – Counts I and II</u>

The Virginia Conspiracy Act, Va. Code Ann. §§ 18.2-499 to 18.2-500, penalizes "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va. Code Ann. § 18.2-499(A).  The same statute also punishes "[a]ny person who *attempts* to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A."  *Id.* at § 18.2-499(B) (emphasis added).

The Act provides a private cause of action for conspiracy.  "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel."  *Id.* at § 18.2-500.

The elements of a Virginia Conspiracy Act claim are: "(1) concerted action[;] (2) legal malice; and (3) causally-related injury."  *Va. Vermiculite, Ltd. v. W.R. Grace & Co. – Conn.*, 144 F. Supp. 2d 558, 601 (W.D. Va. 2001), *aff'd sub nom.*

13

*Va. Vermiculite Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277 (4th Cir. 2002) (citations omitted).[2]  A plaintiff need only allege legal malice rather than actual malice.  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 527 (4th Cir. 1997) (quotation omitted).  Legal malice requires proof that a defendant "acted intentionally, purposely, and without legal justification."  *Id.* (quotation omitted). Thus, the statute requires proof "that at least one of the co-conspirators acted *either* with an unlawful purpose, *or* by unlawful means."  *Virginia Vermiculite, Ltd.*, 144 F. Supp. 2d at 605 (emphases in original).

"To survive a motion to dismiss . . . a plaintiff 'must at least plead the requisite concert of action and unity of purpose,' and must do so 'in more than mere conclusory language.'" *Schlegel v. Bank of America, N.A.*, 505 F. Supp. 2d 321, 326 (W.D. Va. 2007) (quoting *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003)).  At least one decision read *Bay Tobacco* to require "plead[ing] with particularity."  *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004).

---

[2] The elements are set out with more specificity in *Saliba v. Exxon Corp.*, 865 F. Supp. 306 (W.D. Va. 1994), *aff'd*, 52 F.3d 322 (4th Cir. 1995): "'(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff."  865 F. Supp. at 313 (*quoting Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (1984)).

GTSI claims that Wildflower failed to plead facts showing a "combination," that it failed to plead wrongful conduct, and that it did not allege proximate cause or damages. The Court finds that Wildflower's allegations suffice to survive a motion to dismiss under the notice pleading standard.

First, Wildflower properly alleges that GTSI and several third parties undertook "concerted action" to punish Wildflower for its protest of the bid won through what Wildflower claims was the improper affiliation of MultimaxArray and GTSI. *See Bay Tobacco, LLC*, 261 F. Supp. 2d at 499.

GTSI cites this Court's decision in *Stone Castle Finance, Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652 (E.D. Va. 2002), as supporting its argument that parties must provide specific factual descriptions of the conspiracy. In *Stone Castle*, the plaintiff alleged only that "Defendants conspired with [third parties], maliciously and intentionally, for the purpose of interfering with and injuring Stone Castle's business." 191 F. Supp. 2d at 663. The Court found this allegation conclusory and legally insufficient. *Id.* at 664.

Here, however, Wildflower pled more than conclusions. It alleged that "GTSI has agreed, associated, and acted in concert with GAI and other individuals and companies" to injure Wildflower; that GAI, "working in association with and as a front for GTSI," filed baseless bid protests against Wildflower; and that GAI, as part of its collaborative effort with GTSI to harm

15

Wildflower, attempted to pressure several OEMs to stop doing business with Wildflower. (Countercl. ¶¶ 48, 36-37, 42.) These are more than legal conclusions. GTSI's argument that the actions of GTSI and GAI were actually "separate" and "unconnected" is better suited for summary judgment or trial than for a motion to dismiss. (Pl.'s Mem. in Supp. 11.) Similarly, its complaint that Wildflower did not provide "specific detailed factual allegations" of an intent to conspire or to injure Wildflower is not a viable argument at this preliminary stage, where Wildflower is charged only with providing notice of its claims. (Pl.'s Mem. in Supp. 11.)

Wildflower has also pled legal malice – that is, that GTSI "acted intentionally, purposely, and without lawful justification." *Multi-Channel TV Cable Co.*, 108 F.3d at 527 (quotation omitted). Its allegations charge GTSI with purposefully and intentionally conspiring with other businesses to injure Wildflower's business as retribution for Wildflower's bid protest. Wildflower also claims that GTSI undertook wrongful and unlawful acts – for example, that it threatened to retaliate against OEMs that worked with Wildflower and attempted to stop OEMs from offering Wildflower favorable prices on their goods. (Countercl. ¶ 54.) Wildflower alleges that, as part of the conspiracy, an OEM "attempted to force Wildflower to cancel" a government contract. (Countercl. ¶ 52.) And Wildflower claims that GTSI made false representations in this lawsuit.

16

(Countercl. ¶ 55.)  GTSI's claim that any actions it allegedly took were exemplary of nothing more than "vigorous competition" attempts to characterize the facts pled by Wildflower, which must be read in the light most favorable to the non-movant. Wildflower's allegations are sufficient to plead legal malice at this stage.

Wildflower also pled injury and damages.  It has claimed damage to its business reputation, damage to its relationships with customers, and injury due to wasted time, effort and money spent responding to the unlawful conspiracy. (Countercl. ¶ 57.)

Finally, GTSI claims that Wildflower has not pled facts showing proximate cause.  Because the OEMs were not part of the conspiracy, it argues, any decisions by OEMs not to work with Wildflower fall outside the alleged conspiracy.  Reading the counterclaims in the light most favorable to Wildflower, though, it is plausible that the OEMs were part of the conspiracy.  For example, Wildflower claims that the representative of one OEM, "act[ing] at the urging of GTSI," which was a major customer of the OEM, attempted to pressure Wildflower into withdrawing a bid. (Countercl. ¶ 43.)  Section 499 does not require that co-conspirators act with legal malice.  Va. Code Ann. § 18.2-499; *Multi-Channel TV Cable Co.*, 108 F.3d at 527.  GTSI may be able to support a viable proximate cause argument after discovery.  At

this stage, however, Wildflower's Virginia Conspiracy Act claims may go forward.

### 2. Tortious Interference – Count IV

To establish tortious interference with a contract or business expectancy, a plaintiff must establish: (1) the existence of a contract or expectancy; (2) the defendant's knowledge of the expectancy; (3) a reasonable certainty that, but for the defendant's intentional misconduct, plaintiff would have realized the expectancy; (4) the defendant's use of improper means to intentionally interfere with the expectancy; and (5) damage to the plaintiff. *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414 (Va. 1997).

Courts have required plaintiffs to be specific about what expectancy was interfered with. A "'contract expectancy'" is "a contract that [is] expected to come into force in the future." *T.G. Slater & Son, Inc. v. The Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 845 (4th Cir. 2004) (*quoting Maximum, Inc.*, 493 S.E.2d at 378). Plaintiffs must "plead a specific, existing contract or expectancy with a specific party." *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705-06 (E.D. Va. 2004). Wildflower's general allegation that "it is reasonably certain that Wildflower would have realized the business expectancy for those contracts on which it submitted the runner-up bid" does not plead a specific expectancy. As GTSI notes, between March 2007 and December 2008, Wildflower

18

calculated that more than 1,428 FirstSource Contracts were awarded.  (Mem. in Supp. 19; Countercl. ¶ 18.)

Wildflower's attempt to make a blanket allegation about an undefined set of expectancies is insufficient as a matter of law.  Its allegation can be cast as follows: there are 1,428 contracts that Wildflower bid on during a certain time period.  Some sub-set of those contracts was bid on by FirstSource Businesses improperly affiliated with GTSI.  Some sub-set of those contracts was won by the improperly-affiliated company.  For some sub-set of those contracts, Wildflower was the runner-up bidder.  And for some sub-set of those contracts, Wildflower was reasonably certain to have won had the improper competition not occurred.  This is a far cry from pleading the specific expectancies with which GTSI interfered.  Indeed, in the case Wildflower cites in support of the argument that its pleading satisfies Rule 8, the specific expectancy was quite clear: in *Warner v. Buck Creek Nursery, Inc.*, the plaintiff alleged that he had a contractual relationship with the defendant and a business expectancy that his at-will employment contract with the defendant would continue so long as he worked in a satisfactory manner.  149 F. Supp. 2d 246, 266 (W.D. Va. 2001).  There, the defendant was on notice about which business expectancy it was supposed to have tortiously interfered with.  The same cannot be said here.

19

For Wildflower's claim to survive, it also must plausibly allege that GTSI knew about the specific expectancy at issue. *See Masco Contractor Servs. East, Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) (*citing Commerce Funding Corp. v. Worldwide Sec. Serv. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001)).  It is unclear how, in a multi-party bidding situation, GTSI could have known which contracts Wildflower had an expectancy in before they were awarded by the Government.  The Court will dismiss Count IV but grant Wildflower leave to amend its counterclaim.

### 3. Common Law Conspiracy – Count III

A common law conspiracy claim requires that "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by criminal or unlawful means." *T.G. Slater & Son, Inc.*, 385 F.3d at 845 (4th Cir. 2004) (internal quotation marks and quotation omitted).

Count III focuses on GTSI's allegedly wrongful affiliation with several FirstSource Businesses (Countercl. ¶¶ 65-67) and its subsequent competition-by-proxy with Wildflower (Countercl. ¶ 68.)  Wildflower claims that "it is reasonably certain that [it] would have won those contracts for which it submitted the runner-up bid had GTSI not illegally affiliated with FirstSource Businesses to obtain these FirstSource Contracts." (Countercl. ¶ 69.)  It points to several cases in

which parties based state tort claims on government contracts
that they lost after improper action by a competing party. *See,
e.g.*, *Rescue Phone*, 2007 WL 2045514, at *6; *H.E.R.C. Products,
Inc. v. Turlington*, 62 Va. Cir. 489, 493 (Norfolk Cir. Ct. 2003).
GTSI argues that Wildflower's allegations of improper bidding and
affiliation should have been raised with the SBA or the relevant
agency, not in this Court.  It also asserts that Wildflower has
failed to state a cause of action and that it did not plead a
cognizable injury.

A common law conspiracy claim requires damages, not
just an unlawful combination. *See Commercial Bus. Sys., Inc. v.
BellSouth Servs., Inc.*, 453 S.E.2d 261, 267 (1995).  Here, the
claimed damages consist largely of the same lost contracts that
Wildflower pled without sufficient specificity in Count IV.
(Countercl. ¶¶ 68-70.)  "Under Virginia law, when the objective
of a conspiracy is to interfere with a contract, the elements of
tortious interference must all be present." *Canon U.S.A., Inc.
v. Lease Group Resources, Inc.*, 2007 WL 1555394, at *10 (E.D. Va.
May 21, 2007) (citing *Stauffer v. Fredericksburg Ramada, Inc.*,
411 F. Supp. 1136, 1138 (E.D. Va. 1976)).  Because the Court is
dismissing the tortious interference claim without prejudice, it
must also dismiss Count III without prejudice insofar as it
relies on the prospective contracts lost as a result of GTSI's
alleged tortious interference.

21

However, the claim for common law conspiracy can proceed as an alternative cause of action based on the same facts alleged in Counts I-II.  The elements of common law conspiracy cover much the same ground but require less specific pleading than the elements of statutory conspiracy under Virginia law; the allegations of conspiracy to injure Wildflower are sufficient to plead common law conspiracy as well as a violation of Va. Code Ann. § 18.2-499.  *Cf. T.G. Slater & Son, Inc.*, 385 F.3d at 845 (finding conspiracy allegations sufficient to plead both a Virginia common law conspiracy claim and a claim under Va. Code Ann. § 18.2-499).

The claim can also go forward based on the damages that Wildflower claims to have suffered as a result of competing with a business that was not a legitimate competitor.  *See* Def.'s Mem. in Opp'n 19.  As noted above, however, a conspiracy claim using this damages theory will fail if Wildflower cannot prove that the unlawful affiliation and competition occurred or if doing so would require the Court to make a legal finding that it has no power to make.

C. <u>Rule 12(f) Motion to Strike</u>

Plaintiff asks the Court to strike paragraphs 6-19 and 27-39 of Defendant's Counterclaim.  It argues that Defendant has pled "inflammatory and false statements against GTSI" based largely on federal bid protest proceedings to which GTSI did not have access.  (Pl.'s Mem. in Supp. 21.)

22

Rule 12(f) allows a court to strike "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 12(f) motions to strike impertinent or scandalous matter "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Id.* at § 1382.

The Court does not find that the contested paragraphs of Wildflower's Counterclaim contain material that should be stricken at this time. Paragraphs 6-19 and 27-39 are not irrelevant attacks on GTSI. They provide context and background information relevant to Wildflower's counterclaims. They also contain details on Wildflower's successful protest of the alleged MultimaxArray/GTSI bid for the USCIS Contract – an action that, according to the Counterclaim, drew the ire of GTSI and led it to initiate illegal actions against Wildflower. The contested paragraphs are neither immaterial nor unfairly prejudicial. *See Hare v. Family Publ'ns Serv., Inc.*, 342 F. Supp. 678, 685 (D. Md. 1972). Additionally, GTSI's argument that the allegations are false is irrelevant to the motion to strike. The inquiry looks to whether the allegations are "impertinent" or "scandalous." Whether they are true and supportable by admissible evidence will be borne out in discovery.

23

**IV.   Conclusion**

For these reasons, the Court will grant in part and deny in part Plaintiff GTSI Corp.'s motion to dismiss the counterclaims and deny its motion to strike paragraphs 6-19 and 27-39.   Count IV will be dismissed without prejudice and Count III will be dismissed without prejudice insofar as it relies on tortious interference.   The Court will deny the remainder of GTSI's motion.   It will also deny Wildflower's motion to strike the supplemental memorandum but grant its alternative motion to submit a responsive memorandum.

An appropriate Order will issue.


July 17, 2009                        _____/s/_____
Alexandria, Virginia                       James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE